UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BILLIE GRAY,

        Plaintiff,                                       Case No. 18-13888

vs.                                                    HON. MARK A. GOLDSMITH

AUTO-OWNERS INSURANCE
GROUP,

        Defendants.

_____/

## OPINION & ORDER
## DENYING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT (Dkts. 17, 23)

Plaintiff Billie Gray was in a motor vehicle accident on July 18, 2018. Gray filed suit when his insurer, Defendant Auto-Owners Insurance Group ("Auto-Owners"), refused to pay numerous bills he alleges Auto-Owners is obligated to pay under his no-fault personal protection insurance ("PIP") plan. Now, Auto-Owners has filed two motions for summary judgment (Dkts. 17, 23), which collectively present four issues: (i) whether the case should be dismissed under the insurance policy's contractual bar on recovery when the insured party has committed fraud, (ii) whether compensation for Gray's attendant and replacement services should be limited to the period for which a doctor prescribed those services, (iii) whether Gray's Medicare claim should be dismissed, and (iv) whether judicial estoppel justifies dismissal of the case in its entirety.[1] Auto-Owners agreed that a fact issue exists as to the third question. See 1st Reply (Dkt. 24). For the reasons that follow, Auto-Owners' motion is denied in full.

### I. STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is

---

[1] Auto-Owners received permission to file a second motion for summary judgment (Dkt. 22). These motions, and the responses and replies thereto, will be referred to as "1st" and "2d".

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)

Once the movant satisfies its initial burden of demonstrating the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact. Scott, 550 U.S. at 380; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Scott, 550 U.S. at 380 (quoting Matsushita, 475 U.S. at 586), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," id. (quoting Anderson, 477 U.S. at 247-248) (emphasis in original); see also Babcock & Wilcox Co. v. Cormetech, Inc., 848 F.3d 754, 758 (6th Cir. 2017) ("A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.").

## II. ANALYSIS

Auto-Owners' remaining arguments are (i) that Gray's right to benefits were voided when he committed fraud, (ii) that he is not entitled to replacement and attendant services beyond the period for which they were prescribed, and (iii) that Gray should be estopped from pursuing his claims because he failed to disclose this lawsuit when he received bankruptcy relief. None of these arguments entitles Auto-Owners to summary judgment.

### A. Fraud

Gray's policy with Auto-Owners allows Auto-Owners to deny coverage to "any person . . . who has made fraudulent statements or engaged in fraudulent conduct with respect to procurement of this policy or to any occurrence for which coverage is sought." Insurance Policy, Ex. F to 1st Mot. for Summ. J., at PageID.202 (Dkt. 17-7). Auto-Owners has alleged that Gray made fraudulent statements as to three issues: (i) whether he had experienced hearing loss prior to the 2018 accident, (ii) whether he had experienced memory problems and headaches prior to the 2018 accident, and (iii) whether he had been involved in an automobile accident in 2017. See 1st Mot. at 18-20. These allegations and Gray's explanation of his statements are below, followed by an analysis of these claims under Michigan law.

#### 1. Auto-Owners' Allegations of Fraud

The allegedly fraudulent statements concerning Gray's medical history occurred during a deposition Auto-Owners took of Gray during the course of litigating this case. Under the questioning of Gray's attorney, the following exchange occurred:

> Q: And did you have any of these problems prior to the motor vehicle accident in 2018?
> A: No. My other glasses was [sic] all right. But I had to have them—I couldn't see out of them.
> Q: But I'm talking about all your hearing, your—
> A: No. No.
> Q: —memory and all of that. Did you have any of that problems [sic] before the accident?
> A: No, ma'am, not at all. Not at all. Not at all.

Pl. Dep., Ex. 8 to 1st Resp., at PageID.483 (Dkt. 20-9). In addition to this exchange, Gray had the following exchange with counsel for Auto-Owners:

> Q. Have you ever treated with any doctors or complained of any medical conditions or injuries to your ears prior to July, 2018?
> A. No.
> Q. So no issues with loss of hearing before this 2018 accident? None?
> A. No.

Id. at PageID.440.

3

Contrary to these representations, Auto-Owners observes that Gray's medical records indicate a long history of memory problems and headaches:

- On July 22, 2011, following a motor vehicle accident, Gray complained of headaches, memory loss, and difficulty focusing. Records from Plaintiff's 2011 Car Accident, Ex. B PageID.157-158 (Dkt. 17-3).

- On December 13, 2011, Plaintiff had surgery at Michigan Spine & Rehab so that a P-STIM device could be installed, in part to help relieve his headaches. Id. at PageID.161.

- In February 2012, Gray said he was having headaches three times per week. Id. at PageID.162-163.

- In April of 2012, Gray said he had headaches every other day and they lasted for 90 minutes. (This allegation is uncited.)

- In February 2013, Gray sought further evaluation of his headaches. Id. at PageID.164.

Similarly, the records reflect hearing loss prior to the 2018 accident. Id. at PageID.155; 2017 Sinai Grace Hospital Records, Ex. D. to 1st Mot., at PageID.176 (Dkt. 17-5); 2017 Records of Dr. Vijaya Challa, Ex. C to 1st Mot., at PageID.169-171 (Dkt. 17-4) ("2017 Challa Recs.").

Auto-Owners argues that Gray committed further fraud by testifying that aside from the 2018 accident, his only other car accident occurred in 2011. Pl. Dep. at PageID.444. According to a medical record, he told his primary care provider on June 15, 2017, that he had been involved in another motor vehicle accident in May 2017 and had a left knee hairline fracture. 2017 Challa Recs. at PageID.172-174. Auto-Owners presents no other evidence that Gray was in an accident in 2017.

**2. Gray's Explanation of His Testimony**

Gray defends against the claim of fraud with respect to prior medical conditions by attempting to place two factual items in dispute. First, he claims he understood the questions to refer to his condition immediately prior to the accident and answered them truthfully; second, he argues that he may have experienced a memory lapse during the deposition.

4

As evidence for the first argument, Gray points to a June 15, 2017 doctor visit record that expressly noted that Gray was not experiencing headaches. 2017 Challa Recs. at PageID.172-174. The record did not mention memory or hearing loss. Id. More broadly, Gray observes that for the most part, Auto-Owners' evidence is from the two years subsequent to Gray's 2011 accident. The one exception is the hearing loss, which he reported but was not treated for in March 2017, and for which he received treatment from Dr. Challa in October 2017. Gray notes that Dr. Challa attributed the hearing loss to impacted cerumen (earwax buildup), Challa Records at PageID.170, which Gray claims was fully resolved prior to the 2018 accident. Thus, Gray argues that he did not commit fraud, because he answered the questions truthfully, as he understood them.

As evidence for the second claim, that he may have been experiencing a memory lapse, Gray has presented evidence such as a neurology record that includes the following statement:

> He continues to have daily headaches since the accident but he also is frustrated by his difficulty with speech processing. He describes word finding difficulty . . . . When he does speak, he feels like his articulation is poor. He is able to understand most of what is said to him but remains frustrated about not finding the right words to express himself.

Sept. 9, 2018 Record of Dr. Tessy Jenkins, Ex. 7 to 1st Resp., at PageID.408 (Dkt 20-8). His neurologist diagnosed him, among other things, with acquired dysphasia, amnesia, and frontal lobe and executive function deficit. Id. at PageID.411.

Furthermore, during the deposition in which he allegedly committed fraud, Gray referred to problems with his memory and ability to focus. Pl. Dep. at PageID.481. When being examined by counsel for Auto-Owners, he said that he had problems with memory. Id. at PageID.424, 448-449. When asked if he had a headache during the deposition, he said, "Yeah, I got one now. Any time I do a lot of concentration, you know what I'm saying, it comes up." Id. at 482. His difficulties processing language and staying on topic and focused were on display throughout the deposition, such as during an initial exchange in which counsel for Auto-Owners asked him what his name was:

5

> Q: Can you please state your full name for the record, including a middle if you have one.
> A: Billie Gray.
> Q: Do you have a middle name?
> A: No
> . . .
> Q: Are you known by any other names?
> A: No.
> Q: Did you ever have or go by Billie Edward Gray?
> A: Yeah. That's the same name.
> Q: So Edward's your middle name?
> A: Well, it was a given name.
> Q: So it's Billy Edward Gray is your full name?
> A: On my birth certificate it says Billie Gray and school they would say Billie Edward Gray, so –

Pl. Dep. at PageID.419-420.

Later, he could only recall four of his eight children's names. Id. at PageID.423. He could not remember his sister-in-law's name, despite the fact that she was the person he called to come to the scene immediately after his 2018 accident. Id. at PageID.448. After stating that he could remember which carrier provided service for his cell phone, he was asked which one it was. He responded, "Oh boy. He just left. I can't think of it right now right at the moment." Id. at PageID.425-426. He also described difficulty finding words when asked about his back injury: "So now I'll just say I can't remember because I can't—I can't place it and say what I need to say." Id. at PageID.435.

With respect to the alleged 2017 automobile accident, Gray's defense against the fraud allegation is that no accident occurred in 2017.

   3. **Discussion**

Under Michigan law, fraudulent misrepresentations made in the course of an insurance claim may void coverage under the policy. An insurance company seeking to void a policy must establish four elements:

> (1) the misrepresentation was material, (2) that it was false, (3) that the insured knew that it was false at the time it was made or that it was made recklessly, without any knowledge of its truth, and (4) that the insured made the material

6

misrepresentation with the intention that the insurer would act upon it. A statement is material if it is reasonably relevant to the insurer's investigation of a claim.

Bahri v. IDS Prop. Cas. Ins. Co., 864 N.W.2d 609, 612 (Mich. Ct. App. 2014) (internal quotation marks omitted).

### a. Gray's Statements about his Medical History

With respect to Gray's statements about his hearing, memory loss, and headaches prior to the 2018 accident, Auto-Owners has met the first two elements. However, it has not proved the third element—that Gray acted knowingly or recklessly with respect to the truth of his statements—or the fourth element—that he intended that the insurer would act upon his false statements.

This Court has previously noted that "there is ample Michigan precedent supporting the view that evidence of the plaintiff's impaired mental state defeats summary disposition in favor of the insurer." Thomas v. State Farm Mut. Auto. Ins. Co., No. 17-cv-10558, 2018 WL 5719994, at *2 (E.D. Mich. Nov. 1, 2018) (citing Pitts v. Doe, Nos. 338371, 338475, 2018 WL 4002049, at *4 (Mich. Ct. App. Aug. 21, 2018); Hatcher v. Liberty Mut. Ins. Co., No. 330062, 2017 WL 1367119, at *4 (Mich. Ct. App. Apr. 13, 2017)).

Concerning the third Bahri element, both the medical evidence and Gray's own statements during the deposition provide evidence of an impaired mental state that might well have affected his testimony. Furthermore, Gray's assertion that he understood the questions to refer to the time period immediately prior to the 2018 accident is a reasonable explanation for his misstatements, particularly given his noted difficulties with speech processing. A jury could credit this explanation and find that he did not knowingly or recklessly make false statements.

Concerning the fourth Bahri element, Auto-Owners has not proved that Gray provided false information with the intent of misleading Auto-Owners. Gray was forthcoming in informing Auto-Owners of his sources of medical treatment, leading Auto-Owners right to the records that

allegedly contradicted his statement. See Pl. Dep. at PageID.442. Moreover, Gray encouraged Auto-Owners to seek information from his doctors when, for example, he could not remember what medication he was prescribed. Id. at PageID.455. An individual intentionally misleading Auto-Owners might have done less to assist Auto-Owners in uncovering his deception. Certainly, if Gray intended to defraud Auto-Owners, his conduct cannot be excused simply because he committed fraud poorly. But genuine disputes about how to interpret these facts preclude judgment as a matter of law.

Considering all these facts, a reasonable jury could conclude that Gray was merely negligent in failing to give accurate information about his symptoms prior to the 2018 accident, or that he did not intend for Auto-Owners to act on his misstatements. Therefore, Auto-Owners is not entitled to summary judgment based on this argument.

b. The Alleged 2017 Accident

Auto-Owners argues that Gray committed fraud by stating that aside from the 2018 accident, his only other car accident occurred in 2011. See Pl. Dep. at PageID.444. However, Auto-Owners has not proved that Gray's statement was false, as required by Bahri's second element. The only evidence Auto-Owners has presented is the record from June 2017, when Dr. Challa wrote that Gray attributed left knee pain to a motor vehicle accident that had occurred the previous month. 2017 Challa Records at PageID.172-174. Auto-Owners presents no other evidence that Gray was in an accident in 2017. Gray represents in his brief that Challa's record was mistaken, offering the Sinai Grace hospital records as "more detailed, accurate, and credible than Dr. Challa's mere reference to a motor vehicle accident." 1st Resp. at 13 (Dkt. 20). That record states that Gray had been in the hospital in May 2017, the timeframe when the accident allegedly occurred. However, the only hospital record in the record from May 2017 states that Gray reported left knee pain from a football injury several years before and possible osteoarthritis.

8

2017 Sinai Grace Hospital Records at PageID.178-180. The record says nothing about a motor vehicle accident.

Even assuming Dr. Challa accurately recorded Gray's statement, the most Auto-Owners has shown is that Gray made a series of contradicting statements: two supporting the conclusion that he was not in a car accident, and one supporting the conclusion that he was. This is not, on a summary judgment motion, enough to prove that a car accident occurred. Auto-Owners has cast Gray as an unreliable narrator of his own story. Fair enough. But it cannot then turn around and count on him to have told the truth on exactly one occasion. Thus, Auto-Owners has failed to show that Gray's statement to the effect that no accident occurred was false, and its motion fails on the second Bahri element.

### B. Replacement and Attendant Services

Auto-Owners seeks summary judgment on its claim that Gray was not entitled to replacement and attendant services outside the period prescribed by his doctors. Gray's doctors at Northland Radiology prescribed him attendant care and replacement services, which his wife provided. His doctors prescribed two hours of attendant care per day from September 11, 2018 until October 11, 2018, and replacement services from September 11, 2018 until November 10, 2018. Northland Radiology Recs., Ex. G to 1st Mot. (Dkt. 17-8). Gray has submitted a claim for replacement services from July 19, 2018 through June 2, 2019. Replacement Services Forms, Ex. M to 1st Mot. (Dkt. 17-14). He has submitted a claim for attendant care from July 18, 2018 through November 17, 2018. Attendant Care Service Forms, Ex. K to 1st Mot. (Dkt. 17-12).

Under the no-fault statute, recovery is limited to reasonably necessary expenses. See Nasser v. Auto Club Ins. Ass'n, 457 N.W.2d 637, 645 (Mich. 1990). However, Michigan law is also clear that a prescription from the treating physician is not necessary. Douglas v. Allstate, 821 N.W.2d 472, 486-487 (Mich. 2012); see also Kallabat v. State Farm, 662 N.W.2d 97 (Mich. Ct. App. 2003).

9

Kallabat and Douglas both featured physician testimony as to the necessity of the services rendered, arguably distinguishing them from the present circumstances, where Gray has not presented physician testimony or longitudinal medical records demonstrating his need for these services. Nevertheless, Auto-Owners is not entitled to summary judgment, because Michigan law strongly favors allowing juries to decide what is reasonably necessary. For example, in Johnson v. Farmers Ins. Exchange, No. 257831, 2006 WL 1652587 (Mich. Ct. App. June 15, 2006), the plaintiff argued that he was entitled to a directed verdict on the question of the necessity of an expense, because the defendant insurer only offered an adjuster's testimony to rebut plaintiff's medical experts' testimony. Id. at *2. In finding for the insurer, the court found that testimony by the adjuster (a non-neutral layperson) and non-medical evidence of the plaintiff's behavior were enough to create a question of fact for the jury. Id. Furthermore, in Kallabat, the Michigan Court of Appeals held that the plaintiff was entitled to prove his case by circumstantial evidence, allowing the jury to draw inferences about the reasonable necessity of services his doctor did not directly address in his testimony. Kallabat, 662 N.W.2d 97 at 100-101.

Here, Gray has presented undisputed evidence in the form of physician certificates of his need for replacement and attendant services for a limited period. Most of the disputed period for attendant care appears to be the time between the accident and the period for which attendant care was prescribed; a jury could reasonably infer that Gray needed the same care between the time of the accident and the time he saw his doctor for a prescription. Gray's own testimony, though garbled and disjointed at times, supports his claim that he needed and received attendant care until November 2018, and that he needed and received replacement services from his wife Veronica until June 2018. See Pl. Dep. at 43-45, 61-66 (discussing the various tasks he could not complete following his accident). Gray claims he did not receive further medical treatment because Auto-Owners stopped paying his bills; Auto-Owners claims it stopped paying the bills because they

10

were no longer medically necessary. These are all fact questions for a jury to sort out and cannot be resolved on summary judgment.

### C. Judicial Estoppel

The underlying facts supporting Auto-Owners' judicial estoppel argument are mostly uncontested. Gray commenced this litigation in November 2018. On May 10, 2019, Gray filed for a Chapter 7 bankruptcy. Bankruptcy Pet., Ex. B to 2d Mot. for Summ. J. (Dkt. 23-3). He did not list this case as an asset and indicated that he had no pending lawsuits or insurance claims. Bankruptcy Summary of Assets and Liabilities, Ex. C to 2d Mot. (Dkt. 23-4). On May 20, 2019, when asked at his deposition in this case if he had ever filed for bankruptcy, he said "no." Pl. Dep. at PageID.434. On August 13, 2019, the bankruptcy court entered an order of discharge. Ex. D. to 2d Mot. (Dkt. 23-5). On September 20, 2019, counsel for Defendant notified counsel for plaintiff about the bankruptcy while asking for her concurrence to file a motion for leave to file a second motion for summary judgment on the issue of judicial estoppel. Def. 2d Mot. at 3 (Dkt. 23). Gray then filed a motion to re-open his bankruptcy on October 4, 2019. Ex Parte Mot. to Reopen Chapter 7, Ex. E to 2d Mot. (Dkt. 23-6).

However, after the bankruptcy case was re-opened and Basil Simon was re-reappointed as the trustee, Simon's office informed Gray's counsel that first party PIP benefits are not administrable by the bankruptcy trustee. Trustee Emails, Ex. 2 to Resp. to 2d. Mot. (Dkt. 25-3). Lisa Bauer, Office and Trustee Administrator for Simon, wrote that Gray's bankruptcy attorney would amend the bankruptcy schedule, but that there would be "nothing for the bankruptcy estate to do." Id.

The bankruptcy court's docket is consistent with Bauer's statement. See In the Matter of Billie Gray, 19-47112 (Bankr. E.D. Mich. May 9, 2019-Nov. 16, 2019). On October 7, 2019, Simon submitted a notice of withdrawal of his previous trustee's report of no distribution (19-47112 Dkt. 24), and an interim trustee's report that included a description of the instant lawsuit

11

(19-47112 Dkt. 25). On October 15, he submitted a trustee's report of no distribution. On October 16, the bankruptcy court issued a final decree and closed the case.

Judicial estoppel is an equitable doctrine invoked to preserve the integrity of the judicial system. See New Hampshire v. Maine, 532 U.S. 742, 749-750 (2001). "Generally speaking, the doctrine serves to prevent a party from engaging in cynical gamesmanship by arguing and prevailing on one position before one court, and then arguing the opposite position before another." In re Barge, 953 F.3d 907, 922 (6th Cir. 2020). Auto-Owners argues that Gray should be estopped from pursuing this lawsuit because the bankruptcy court, relying on Gray's misrepresentations, adopted Gray's position that this lawsuit did not exist.

The Sixth Circuit has developed a specific test for circumstances in which defendants argue that plaintiffs should be estopped from pursuing claims that were not disclosed in a prior bankruptcy proceeding:

> In short, to support a finding of judicial estoppel, we must find that: (1) [Plaintiff] assumed a position that was contrary to the one that [he] asserted under oath in the bankruptcy proceedings; (2) the bankruptcy court adopted the contrary position either as a preliminary matter or as part of a final disposition; and (3) [Plaintiff's] omission did not result from mistake or inadvertence. In determining whether [Plaintiff's] conduct resulted from mistake or inadvertence, this court considers whether: (1) [he] lacked knowledge of the factual basis of the undisclosed claims; (2) [he] had a motive for concealment; and (3) the evidence indicates an absence of bad faith.

White v. Wyndham Vacation Ownership, Inc., 617 F.3d 472, 478 (6th Cir. 2010).

Gray's primary resistance to the judicial estoppel claim is that he had no obligation to disclose an exempt asset. See 2d. Resp. at 12-13. This is incorrect, because "a debtor has an affirmative duty to disclose all of its assets to the bankruptcy court." Browning v. Levy, 283 F.3d 761, 775 (6th Cir. 2002) (citing 11 U.S.C. § 521(1). In completing the required schedules, "debtors have the absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or unavailable to the bankruptcy estate. This is because the bankruptcy court, not the debtor, decides what property is exempt from the bankruptcy estate." In re Robinson, 292

B.R. 599, 607 (Bankr. S.D. Ohio 2003) (internal marks and citations omitted). Indeed, Gray listed numerous assets he believed to be exempt. See Bankruptcy Summary of Assets and Liability. Therefore, Auto-Owners is correct that Gray was obligated to disclose this suit on his bankruptcy schedules. Auto-Owners has also proved Wyndham's first element, because Gray's assertion in the bankruptcy court that this case did not exist is contrary to his position that he is entitled to relief in this case.

The question of whether the bankruptcy court adopted Gray's position is more complicated. White found that judicial acceptance occurred when the bankruptcy court approved a payment from the bankruptcy estate "'on the basis of'" the debtor's assertion of a given position. White, 617 F.3d at 479 (quoting Lewis v. Weyerhaeuser Co., 141 F. App'x 420, 425 (6th Cir. 2005)). But here, Auto-Owners has failed to show that the bankruptcy court took any action on the basis of Gray's representation that he had no outstanding lawsuits or insurance claims. That is because the trustee has taken the position that any proceeds of this suit would not be available for the estate to administer to Gray's creditors, because first party PIP benefits are exempt. Auto-Owners has done nothing to rebut the trustee's assertion, except to identify two cases in which a trustee sought third-party PIP benefits. See 2d Reply at 4 (Dkt. 26) (citing Estate of Vawters v. Auto Club Ins. Ass'n, No. 342805, 2019 WL 2765581, at *1, n.1 (Mich. Ct. App. Aug. 8, 2019); In Re Opra, 365 B.R. 728, 740 (Bankr. E.D. Mich. 2007)). These cases are irrelevant, as all agree that third-party PIP benefits would present a different circumstance, as recoveries in such cases would be available for creditors. Furthermore, upon learning of this lawsuit and receiving the trustee's updated report, the bankruptcy court closed the case with no distribution to creditors—the same result it reached before. Thus, Auto-Owners has failed to prove that the bankruptcy court took any action on the basis of Gray's misrepresentation.

Auto-Owners has also failed to prove that Gray's failure to disclose this suit was not mistaken or inadvertent. This element depends on whether (i) Gray lacked knowledge of the

13

factual basis of the undisclosed claims; (ii) he had a motive for concealment; and (iii) the evidence indicates an absence of bad faith. White, 617 F.3d at 478. It is fair to assume that Gray did not lack knowledge of the factual basis of the insurance claim at issue in this case. However, he may not have had any motive for concealment, and the evidence indicates a lack of bad faith.

The question of motive is complicated. Auto-Owners argues that Gray was motivated by monetary gain, noting that Gray "even listed the very medical expenses he incurred from the accident in his bankruptcy filings." 2d Mot. at 9. But Auto-Owners has failed to prove that the estate would actually have been entitled to the proceeds of this suit. Based on the bankruptcy trustee's representation and the bankruptcy court's actions, it seems that if Gray had properly disclosed this suit, he would not have risked the proceeds of this suit being distributed to his creditors. On the other hand, it seems unlikely that Gray would have known this obscure detail of bankruptcy law, which neither his attorney for this case nor his bankruptcy attorney appears to have known. Evaluating Gray's true and operative motives is impossible without assessing his credibility, a task reserved to a jury.[2]

The final factor in determining whether Gray's misrepresentation resulted from mistake or inadvertence is whether the evidence indicates a lack of bad faith. As discussed with respect to

---

[2] Adding one additional layer of complication, it is less than fully clear that Gray would fail the "mistake or inadvertence" test if Gray omitted this claim from his bankruptcy filing because of a mistaken belief that he could benefit from concealing it. When White asks about "motive," it is not clear whether it is asking a subjective question—did Gray mean to mislead the court?—or an objective question—did Gray have an incentive to mislead the court? The latter interpretation finds support in a recent case, where the Sixth Circuit stated, "For judicial estoppel to apply, three features should be present: (1) the party's prior and later positions are clearly inconsistent; (2) the earlier court accepted the prior position; and (3) the opposing party would be unfairly disadvantaged by the subsequent court accepting the party's later, inconsistent position." In re Berge, 953 F.3d at 922 (citing New Hampshire, 537 U.S. at 750-751). The third factor in the In re Berge test focuses on a disadvantage actually imposed, rather than a theoretical, subjectively intended one. Because there is a question of fact regardless of whether the disadvantage must be viewed objectively or subjectively, Auto-Owners has not met its summary judgment burden to establish judicial estoppel, as a matter of law.

fraud, Gray has diagnosed difficulties with speech processing and memory. This would adequately explain his mistakes and omissions. On its summary judgment motion, Auto-Owners is not entitled to the benefit of its proposed interpretation of facts.

One additional fact bears mention: Auto-Owners was listed as a creditor in Gray's bankruptcy schedules. Bankruptcy Summary of Assets and Liabilities at PageID.565. In all likelihood, this means that Auto-Owners was simultaneously aware of the two lawsuits, and of Gray's allegedly inconsistent positions. Auto-Owners appears to have sat on this information until the bankruptcy process was complete, allowing Gray (in Auto-Owners' view) to manipulate the judicial system and deprive the bankruptcy estate of additional funds. Although Gray's failure to disclose this lawsuit appears to have been harmless, had the facts and law been as Auto-Owners believed them to be, Auto-Owners would have deprived its fellow creditors of any benefits to be reaped from the proceeds of this lawsuit, thereby exploiting the judicial system in the process. This would seem to qualify as "cynical gamesmanship" on Auto-Owners' part, making it potentially unworthy of reaping a windfall in this lawsuit as a protector of the sanctity of the courts. Because the record is not yet fully developed, the Court need not make an ultimate pronouncement on this point.

### III. CONCLUSION

For the reasons stated above, Auto-Owners motions (Dkts. 17, 23) are denied.

SO ORDERED.

Dated: July 31, 2020　　　　　　　　　　　　　　s/Mark A. Goldsmith  
　　Detroit, Michigan　　　　　　　　　　　　　MARK A. GOLDSMITH  
　　　　　　　　　　　　　　　　　　　　　　United States District Judge